# In the
# United States Court of Appeals
## For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 17-1178

INTERNATIONAL ASSOCIATION OF MACHINISTS DISTRICT
TEN and LOCAL LODGE 873,

*Plaintiff-Appellee,*

*v.*

RAY ALLEN, in his capacity as Secretary of the Wisconsin
Department of Workforce Development, et al.,

*Defendants-Appellants.*

———————————

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 16-CV-77 — **William M. Conley**, *Judge.*

———————————

ARGUED SEPTEMBER 15, 2017 — DECIDED SEPTEMBER 13, 2018

———————————

Before MANION, ROVNER, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Wisconsin's Act 1 of 2015, codi-
fied at Wis. Stat. § 111.01 et seq., changed many provisions of
that State's labor laws. This case deals with a narrow provi-
sion of Act 1 that attempts to change the rules for payroll de-
ductions that allow employees to pay union dues through
dues-checkoff authorizations.

A dues-checkoff authorization is a contract between an employer and employee for payroll deductions. These are "arrangements whereby [employers] would check off from employee wages amounts owed to a labor organization for dues, initiation fees and assessments." *Felter v. Southern Pacific Co.*, 359 U.S. 326, 330–31 (1958). By signing an authorization, the employee directs the employer to deduct union dues or fees routinely from the employee's paycheck and to remit those funds to the applicable union. Many of these authorizations are irrevocable for a specified period—often one year—for reasons of administrative simplicity. See Dkt. 43 at 2 (Elizondo Aff.); see also *N.L.R.B. v. Atlanta Printing Specialties and Paper Prods. Union 527*, 523 F.2d 783, 786 (5th Cir. 1975). The union itself is not a party to the authorization, which is effective if and only if the employee wishes. Federal law has long provided, however, that unions can bargain collectively with employers over the standard terms of dues-checkoff authorizations.

The Taft-Hartley Act imposes three limits on dues-checkoff authorizations: the authorization must be (1) individual for each employee, (2) in writing, and (3) irrevocable for no longer than one year. See 29 U.S.C. § 186(a)(2), (c)(4). Wisconsin's Act 1 attempts to shorten this maximum period to thirty days. See 2015 Wis. Act 1, § 9, codified at Wis. Stat. § 111.06(1)(i).

The district court found that Wisconsin's attempt to impose its own time limit on dues-checkoff authorizations is preempted by federal labor law, and the court issued a permanent injunction barring enforcement of that provision. *International Ass'n of Machinists District 10 v. Allen*, No. 16-cv-77, 2016 WL 7475720, at *7 (W.D. Wis. Dec. 28, 2016). We affirm.

This case is controlled by the Supreme Court's summary affirmance in a case finding a nearly identical State law preempted. *Sea Pak v. Indus., Tech. & Prof. Employees, Div. of Nat'l Maritime Union*, 400 U.S. 985 (1971) (mem.). We reject Wisconsin's effort to undermine the precedential force of *Sea Pak*, which is fully consistent with more general federal labor law preemption principles. See, e.g., *Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132, 140–42, 153 (1976). Wisconsin's attempt to short-circuit the collective bargaining process and to impose a different dues-checkoff standard is preempted by federal law.

I.   *Factual and Procedural History*

   A. *Wisconsin Act 1*

   Before Act 1 was enacted in 2015, Wisconsin law had allowed so-called union security agreements in which unions and employers would agree that employees would be required either to join the union or pay fair-share fees. That changed with Act 1's "right-to-work" provisions, which prohibit employers from requiring their employees to pay dues or fees to a union. See *International Union of Operating Engineers Local 139 v. Schimel*, 863 F.3d 674, 676–77 (7th Cir. 2017), excerpting 2015 Wis. Act 1, § 5, codified at Wis. Stat. § 111.04(3)(a). Act 1 provides in part: "No person may require, as a condition of obtaining or continuing employment, an individual to … Pay any dues, fees, assessments, or other charges … to a labor organization." § 111.04(3)(a)(3). This also meant that Wisconsin employers and unions could no longer enter into an enforceable mandatory union security agreement—a term in a collective bargaining agreement where an employer promises the union that, as a condition of employment, it will require its employees to maintain membership in

the union. We held in *Schimel* that this "right-to-work"/mandatory union security agreement portion of Act 1 is not preempted by federal law. 863 F.3d at 677.[1]

The section of Act 1 challenged in this lawsuit attempts a less dramatic change in labor law. It requires employers to terminate dues-checkoff authorizations within thirty days of receiving written notice from the employee. 2015 Wis. Act 1, § 9, codified at Wis. Stat. § 111.06(1)(i). This challenged provision reads:

> (1) It shall be an unfair labor practice for an employer individually or in concert with others: …

> (i) To deduct labor organization dues or assessments from an employee's earnings, unless the employer has been presented with an individual order therefor, signed by the employee personally, and terminable by the employee giving to the employer at least 30 days' written notice of the termination. This paragraph applies to the extent permitted under federal law.

B. *The Dispute at the John Deere Plant*

This case stems from a complaint filed with the Wisconsin Department of Workforce Development, the State agency that enforces Wisconsin's wage laws. Lisa Aplin, an assembler at a John Deere plant in Wisconsin, signed a dues-checkoff authorization in November 2002. Her authorization instructed John Deere to deduct union dues from her paychecks and to

---

[1] *Schimel* followed our decision in *Sweeney v. Pence*, 767 F.3d 654 (7th Cir. 2014), where a divided panel upheld an identical Indiana law, and rehearing en banc was denied by an equally divided court.

remit them to the International Association of Machinists District 10 and Local Lodge 873, the plaintiffs-appellees here, which we refer to as the Machinists or the union. Aplin's authorization said that it was "irrevocable for one (1) year or until the termination of the collective bargaining agreement … whichever occurs sooner." It also provided that it would be automatically renewed for successive one-year periods unless the collective bargaining agreement terminated or Aplin gave notice during a fifteen-day annual period. The authorization also provided that it was "independent of, and not a quid pro quo for, union membership." This arrangement remained in effect until 2015. As the State explains, dues-checkoff authorizations like this are a convenient way for employees to pay their union dues or fair-share fees.

In the wake of Act 1, John Deere and the Machinists updated their collective bargaining agreement, but they left in place a term making dues-checkoff authorizations irrevocable for one year. In July 2015, Aplin sent a letter to John Deere and the union invoking Act 1 and requesting the termination of her dues-checkoff authorization. The union responded that her request was untimely and could not be granted unless she renewed it during the annual cancellation period that November.

Aplin then filed a complaint with the State agency claiming that John Deere was violating State wage laws by not honoring within thirty days her attempt to revoke the dues-checkoff authorization. She sought a refund of $65.60 in union dues deducted from her pay after the cancellation would have taken effect. In November 2015, the agency sided with Aplin, finding that Wis. Stat. § 111.06(1)(i) applied and that John Deere had to honor Aplin's cancellation and refund request,

or face enforcement action. The company then reimbursed Aplin for the $65.60 deducted from her paycheck. Around the same time, the agency handled another similar dues-checkoff complaint invoking Wis. Stat. § 111.06(1)(i) and concluded that it "must enforce the statute in its current form" unless and until it was found preempted.

## C. *This Federal Lawsuit*

In February 2016, the Machinists filed this action in the Western District of Wisconsin and moved to enjoin the State from enforcing Act 1's dues-checkoff provision. The union contended that the federal Labor-Management Relations Act of 1947, better known as the Taft-Hartley Act, preempted Act 1 on this score. See Pub. L. No. 80–101, § 302(a), (c)(4), 61 Stat. 157, codified at 29 U.S.C. § 186(a), (c)(4).

To protect against corruption in the collective bargaining process, the Taft-Hartley Act, as amended, prohibits "any employer or association of employers" from giving "any money or other thing of value" to "any labor organization," § 186(a)(2), unless one of a long list of exceptions applies. § 186(c). The exception relevant here provides:

> The [prohibition] provisions of this section shall not be applicable …
>
> (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevoc-

> able for a period of more than one year, or be-
> yond the termination date of the applicable col-
> lective agreement, whichever occurs sooner … .

§ 186(c)(4). The union argued that this year-long dues-checkoff exception in federal labor law is incompatible with, and thus preempts, the corresponding thirty-day provision of Wisconsin's Act 1.

The district court granted the union's motion for summary judgment and permanently enjoined enforcement of Wis. Stat. § 111.06(1)(i). 2016 WL 7475720, at *7–8. The district court found that this issue was "relatively straightforward, since its resolution is controlled by the United States Supreme Court's decision" in *Sea Pak. Id*. at *3, citing 400 U.S. 985 (1971).

## II. *Analysis*

We review the legal conclusions of summary judgment rulings *de novo*, construing all facts and drawing all reasonable inferences in favor of the non-moving parties. See *Wisconsin Central Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). Here, however, because there are no genuine issues of material fact, we must decide only whether the union is entitled to a judgment as a matter of law. *Id.*; Fed. R. Civ. P. 56(c). The main issue in this appeal is whether Wis. Stat. § 111.06(1)(i) is preempted by Taft-Hartley's § 302(c)(4), codified at 29 U.S.C. § 186(c)(4). We also must address whether Taft-Hartley's § 14(b) exception to preemption for State "right-to-work" laws—codified at 29 U.S.C. § 164(b)—allows Wisconsin to do what it attempted to do here.

We conclude that the Taft-Hartley Act preempts Wisconsin's attempt to set new rules for dues-checkoff authorizations governed by § 186(c)(4). Because the challenged portion of

Act 1 regulates an employee's optional dues-checkoff author-
ization rather than an employee's obligation to pay dues as a
condition of employment, it falls outside the scope of the
§ 164(b) "right-to-work"/union security agreement exception.
We explain in Part II-A that we agree with the district court
that the Supreme Court's summary affirmance in *Sea Pak* con-
trols this case. In Part II-B, we explain why *Sea Pak* fits com-
fortably with broader preemption principles of labor law. In
Part II-C, we address and reject further arguments by the State
for recognizing an exception from those principles here.

A.  *Sea Pak's Continuing Force*

The procedural history of the *Sea Pak* decision was a bit
unusual, but the district court correctly found that the Su-
preme Court's summary affirmance in *Sea Pak* controls here.
The Supreme Court has instructed that "the lower [federal]
courts are bound by summary decisions by this Court 'until
such time as the Court informs (them) that (they) are not,'"
because "votes to affirm summarily … are votes on the merits
of a case," just like those accompanied by fully reasoned
Court opinions. *Hicks v. Miranda*, 422 U.S. 332, 344–45 (1975)
(brackets and citation omitted).

To understand the effect of a summary affirmance, it is
usually necessary to look closely at the decision that was sum-
marily affirmed. In *Sea Pak*, the Southern District of Georgia
found a Georgia law very similar to Act 1 preempted. A Geor-
gia law required employers to treat dues-checkoff authoriza-
tions as revocable at will. The district court found that provi-
sion was "completely at odds" and "in direct conflict" with 29
U.S.C. § 186(c)(4), which, as noted, permits dues-checkoffs to
be irrevocable for up to one year. 300 F. Supp. 1197, 1200 (S.D.

Ga. 1969).[2] "A union is thus permitted to bargain for and receive a checkoff of dues under authorizations which may be irrevocable for as long as one year." *Id.* This Taft-Hartley provision meant "that no room remains for state regulation in the same field." *Id.*[3]

The district court in *Sea Pak* also noted that Judge Noland of the Southern District of Indiana had reached the same conclusion on the same preemption question, holding that § 186(c)(4) preempted an Indiana wage assignment law requiring assignments to be revocable at will. *Id.* at 1198–99, citing *International B'hood of Operative Potters v. Tell City Chair Co.*, 295 F. Supp. 961, 965 (S.D. Ind. 1968) (§ 186 "specifies the conditions necessary for a valid check-off, and … is sufficiently

---

[2] The district court also noted that the original House-passed version of § 186(c)(4) would have made dues-checkoffs "revocable by the employee at any time upon thirty days written notice to the employer," *Sea Pak*, 300 F. Supp. at 1200—the same policy Wisconsin has attempted to impose here. The final version of § 186(c)(4) allowed the maximum period to be as long as a full year. The district court concluded: "I cannot be persuaded that Federal preemption fails merely because Congress saw fit to adopt a less liberal power of revocation" in setting ground rules for dues-checkoff authorizations. *Id.*

[3] In so holding, the *Sea Pak* district court interpreted § 186(c)(4) the same way the Supreme Court had already read a nearly identical provision in the Railway Labor Act in *Felter*, see 359 U.S. at 330–31, discussed below at 20–23. The *Sea Pak* district court's reasoning also correctly anticipated the Supreme Court's decision seven years later in *Machinists*, 427 U.S. at 153, where the Court found that certain aspects of the "federal regulatory scheme" of labor-management relations "leave the parties free" from "state attempts to influence the substantive terms of collective bargaining agreements" and from such attempts by the National Labor Relations Board.

pervasive and encompassing" to preempt State wage assignment laws).

The *Sea Pak* district court also had to decide whether the Taft-Hartley provision in 29 U.S.C. § 164(b), which permitted States to outlaw "agreements requiring union membership as a condition of employment," also allowed a State to enact check-off provisions contrary to what is provided in § 186(c)(4). 300 F. Supp. at 1199–1200. The court found that the State's dues-checkoff regulation was not saved by § 164(b): "Checkoff authorizations irrevocable for one year after [their authorization] date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time." *Id.* at 1201.

The Fifth Circuit affirmed *per curiam*, adopting the district court's opinion. 423 F.2d 1229, 1230 (5th Cir. 1970). The Supreme Court affirmed that decision summarily, without opinion. 400 U.S. 985 (1971). Both preemption arguments advanced in this case were "presented and necessarily decided" by the Court's summary affirmance in *Sea Pak*; they did not "merely lurk in the record." See *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–83 (1979) (precedential effect of summary affirmance extends only to "the precise issues presented and necessarily decided," not to questions that "merely lurk in the record"). *Sea Pak* controls this case.[4]

---

[4] The employer-appellant in *Sea Pak* presented the following questions to the Supreme Court, invoking mandatory appellate jurisdiction under 28 U.S.C. § 1254(2) (1970):

A. Whether the Georgia Statute requiring that dues assignments be revocable at will is in conflict with or preempted by Section 302(c)(4) of the Labor Management Relations Act.

The State argues, though, that even if *Sea Pak* applies, subsequent developments in the Supreme Court's case law on preemption mean that *Sea Pak* is no longer binding. Language in *Hicks v. Miranda* may offer a small opening for lower courts to depart from summary decisions "when doctrinal developments indicate otherwise." 422 U.S. at 344, quoting *Port Authority Bondholders Protective Comm. v. Port of New York Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967) (addressing dismissals for lack of substantial federal questions), and citing *Doe v. Hodgson*, 478 F.2d 537, 539 (2d Cir. 1973) (lower courts should follow summary decisions until Supreme Court says otherwise). We found such an opening in *Baskin v. Bogan*, 766 F.3d 648, 659 (7th Cir. 2014), finding that a 1972 summary dismissal for want of a substantial federal question rejecting a constitutional claim for same-sex marriage was no longer binding in light of a consistent series of more recent Supreme Court decisions recognizing certain sexual orientation rights under the Constitution. To the extent there might be any theoretical room for departing from the summary affirmance in *Sea Pak*, it would take much stronger signals from the Court to do so.

---

B. Whether the Georgia Statute is a valid exercise of the authority reserved to the Georgia legislature by Section 14(b) of the Labor Management Relations Act, and is, therefore not saved from preemption.

Statement as to Jurisdiction for the Appellant at 5, *Sea Pak*, 400 U.S. 985 (No. 70-463), 1970 WL 136846, at *4. The issues presented here are indistinguishable. The Georgia law made dues-checkoffs "revocable at the will of the employee," *Sea Pak*, 300 F. Supp. 1199, while Wis. Stat. § 111.06(1)(i) grants an at-will cancellation right to employees, to take effect in thirty days. This thirty-day delay is a distinction without a difference. Both statutes operate to shorten considerably the irrevocability period of dues-checkoff agreements otherwise permitted under Taft-Hartley.

As we explain in Part II-B, there has been no comparable sea-change in labor-law preemption or preemption more generally that would justify a lower court in departing from *Sea Pak*.

In addition, to agree with the State and reverse here, we would have to split with two other circuits. See *United Auto., Aerospace & Agric. Implement Workers of Am. Local 3047 v. Hardin County*, 842 F.3d 407, 410, 421–22 (6th Cir. 2016) (following *Sea Pak* to invalidate county ordinance regulating dues-checkoff authorizations); *N.L.R.B. v. Shen-Mar Food Products, Inc.*, 557 F.2d 396, 399 (4th Cir. 1977) (agreeing with NLRB that "the check-off provision was not a Union security device which would be subject to State law under Section 14(b)" of Taft-Hartley); see also *N.L.R.B. v. Atlanta Printing Specialties and Paper Products Union 527*, 523 F.2d 783, 784, 787–88 (5th Cir. 1975) (enforcing NLRB order to employer and union to honor dues-checkoff cancellations tendered during annual escape period of fifteen days). We agree with the Sixth Circuit that *Sea Pak*'s "authority remains essentially unchallenged" today. *Hardin County*, 842 F.3d at 421.

B. *Labor Law Preemption More Generally*

1. *Machinists and Garmon Preemption*

The State urges us to decide this case under more general field- or conflict-preemption principles. We conclude, however, that *Sea Pak* is consistent with the Court's other labor law preemption decisions, which provide quite clear guidance here. In *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1480 (2018), the Supreme Court explained that all forms of federal preemption "work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that

conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." Most relevant for this case, "field preemption" occurs "when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation.'" *Id.*, quoting *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 140 (1986). Federal statutes that preempt a field "reflect[] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Murphy*, 138 S. Ct. at 1481, quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012).

Over the decades since enactment of the National Labor Relations Act and the Taft-Hartley Act, the Supreme Court has applied field preemption in a host of cases interpreting those laws. The resulting body of law reflects many individual applications of the general principles of preemption, and labor-law preemption cases specifically provide the most reliable guidance for us in this case, if any were needed beyond the Court's summary affirmance in *Sea Pak*.

Labor law preemption applies, to put it broadly, when a State acts "as regulator of private conduct" with an "interest in setting policy" that is different from the policy of the federal government. *Building & Constr. Trades Council v. Associated Builders & Contractors of Mass./R. I., Inc.*, 507 U.S. 218, 229 (1993) (*Boston Harbor*). Most relevant here are two forms of field preemption in labor law, known as *Garmon* preemption and *Machinists* preemption. The Supreme Court has explained:

> The first, known as *Garmon* pre-emption, see
> *San Diego Building Trades Council v. Garmon*, 359

U.S. 236 (1959), "is intended to preclude state in-
terference with the National Labor Relations
Board's interpretation and active enforcement
of the 'integrated scheme of regulation' estab-
lished by the [National Labor Relations Act (or
NLRA, also known as the Wagner Act)]." *Golden
State Transit Corp. v. Los Angeles*, 475 U.S. 608,
613 (1986) (*Golden State I*). To this end, *Garmon*
pre-emption forbids States to "regulate activity
that the NLRA protects, prohibits, or arguably
protects or prohibits." *Wisconsin Dept. of Indus-
try v. Gould Inc.*, 475 U.S. 282, 286 (1986). The sec-
ond, known as *Machinists* pre-emption, forbids
both the National Labor Relations Board
(NLRB) and States to regulate conduct that Con-
gress intended "be unregulated because left 'to
be controlled by the free play of economic
forces.'" *Machinists v. Wisconsin Employment Re-
lations Comm'n*, 427 U.S. 132, 140 (1976) (quoting
*NLRB v. Nash–Finch Co.*, 404 U.S. 138, 144
(1971)). *Machinists* pre-emption is based on the
premise that "'Congress struck a balance of pro-
tection, prohibition, and laissez-faire in respect
to union organization, collective bargaining,
and labor disputes.'" 427 U.S., at 140, n. 4 (quot-
ing [Archibald] Cox, Labor Law Preemption Re-
visited, 85 Harv. L. Rev. 1337, 1352 (1972)).

*Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008); see also
*520 South Michigan Ave. Assoc. v. Shannon*, 549 F.3d 1119, 1125–
26 (7th Cir. 2008) (summarizing *Garmon* and *Machinists*
preemption doctrines).

Both the *Garmon* and *Machinists* doctrines apply broadly to the Wagner (NLRA) and Taft-Hartley Acts: "the object of labor pre-emption analysis," according to the Court, is "giving effect to Congress' intent in enacting" provisions of "the Wagner and Taft-Hartley Acts" as statements of national labor-management policy. *Brown*, 554 U.S. at 73; see also *Belknap, Inc. v. Hale*, 463 U.S. 491, 524–25 (1983) (referring to "the Wagner and Taft-Hartley Acts" as a cohesive whole), citing *N.L.R.B. v. Insurance Agents*, 361 U.S. 477, 489 (1960); *Machinists*, 427 U.S. at 141 (same).

*Machinists* preemption is quite broad. It recognizes that federal labor statutes "specifically conferred on employers and employees" a right to determine certain questions through bargaining and the use of other "permissible economic tactics," and to be free from government fiat in finding solutions. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 112–13 (1989) (*Golden State II*) (where *Machinists* applies, it extends a right enforceable under 42 U.S.C. § 1983). Although "the rule of the *Machinists* case is not set forth in the specific text of an enumerated section of the NLRA," that statute's "language and structure" offer "a guarantee of freedom for private conduct that the State may not abridge." *Id.* at 111–12. *Machinists* instructs that both the NLRB and the States "are without authority to attempt to introduce some standard of properly balanced bargaining power" or to impose "an ideal or balanced state of collective bargaining" because Congress intended to leave such balancing to labor and management. *Machinists*, 427 U.S. at 149–50 (quotations and citations omitted). "[T]he legislative purpose" as determined from the text and structure of the Wagner and Taft-Hartley Acts "may … dictate that certain activity neither protected nor prohibited" by federal labor law may "be deemed privileged against state

regulation." See *id.* at 141, quoting *Hanna Mining Co. v. Marine Engineers*, 382 U.S. 181, 187 (1965).

For example, we applied *Machinists* preemption to an Illinois law that required cemeteries and gravediggers to negotiate to establish a pool of workers who would "perform religiously required interments during labor disputes." *Cannon v. Edgar*, 33 F.3d 880, 882, 885–86 (7th Cir. 1994). Despite the State law's benign purpose to respect certain faiths' beliefs concerning timely burial, the law impermissibly "meddle[d] with the collective bargaining process" by "directly interfer[ing] with the ability of" labor and management "to reach an agreement unfettered by the (labor) restrictions of state law." *Id.* at 886; see also *id.* at 885 (finding same statute preempted under *Garmon* as well). Similarly, we applied *Machinists* preemption to an Illinois law that required hotels to give custodial workers specified break periods, rather than leave the issue to collective bargaining. We found that the law was not a minimum labor standard but a specific intrusion into collective bargaining in a particular industry. *520 S. Michigan Ave.*, 549 F.3d at 1121.

Even State laws with indirect effects on bargaining can be preempted under *Machinists*. Though *Machinists* itself was directed at a union's "refusal to work overtime" and the economic pressure that the refusal placed on the employer, see 427 U.S. at 154, 155, it bars State regulation in any "zone protected and reserved for market freedom" by federal labor law. *Boston Harbor*, 507 U.S. at 226–27 (city governments are "preempted from conditioning renewal of a taxicab operating license upon the settlement of a labor dispute"), citing *Golden State I*, 475 U.S. at 618. In such zones, the Court observed in *Brown*, "the States have no more authority than the Board to

upset the balance that Congress has struck between labor and management." 554 U.S. at 74 (brackets omitted), quoting *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 751 (1985).

Before turning to more specific discussion of *Garmon* and *Machinists* preemption principles as applied to dues-checkoff authorization, we address the State's broadest argument, which is that the court should apply a much more demanding standard for preemption than was applied in *Sea Pak*, *Garmon*, or *Machinists*. The State cites and quotes Justice Kagan's concurring opinion in *Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 638 (2012), which observes that some older preemption cases may seem anachronisms in terms of newer preemption principles and precedents.

*Kurns* itself provides the best answer to the argument. Both the *Kurns* majority and Justice Kagan followed the arguably "anachronistic" decision in *Napier v. Atlantic Coast Line Railroad Co.*, 272 U.S. 605 (1926) (applying field preemption under Locomotive Inspection Act for railroad safety equipment). They did so because *Napier* had established the preemptive force of that statute decades earlier and *Congress had not acted to change that law*. 565 U.S. at 633 (majority); *id*. at 638 (Kagan, J., concurring). As in *Kurns*, the Supreme Court has often observed that principles of *stare decisis* take on "special force" on issues of statutory interpretation. They do so precisely because Congress can legislate to correct an erroneous decision by the Court. E.g., *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765 (2011) (patent law); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) (antitrust law). A case that makes that point with special force, because Congress did respond with new legislation, is *Patterson v. McLean Credit Un-*

*ion*, 491 U.S. 164, 172–73 (1989) (civil rights litigation), super-seded by Civil Rights Act of 1991, as stated in *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 450 (2008).

The State's reliance on more general principles of preemp-tion from other statutory contexts thus fails to engage with the doctrinal heart of this case, which is the decades of deci-sions deciding the preemptive force of the Wagner and Taft-Hartley Acts. The issue before us is the preemptive scope of the Taft-Hartley Act, so the most relevant guides are the Su-preme Court's decisions under that statute. Moreover, one cannot call *Garmon* and *Machinists* "anachronisms" when the Court has been citing and following them on a regular basis. See, e.g., *Brown*, 554 U.S. at 66 (2008 decision discussing both and applying *Machinists* preemption); *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 49 (1998) (applying *Garmon* preemp-tion); *Golden State I*, 475 U.S. at 615–16 (1986 decision applying *Machinists* preemption).

### 2. *Preemption for Dues-Checkoff Rules*

Returning to the text of the relevant Taft-Hartley provi-sion, 29 U.S.C. § 186(c)(4), federal labor law imposes only min-imal rules for collective bargaining on dues-checkoff authori-zation. Federal law leaves other details for resolution by pri-vate actors—employers, unions, and employees—through the collective bargaining and dues-checkoff authorization pro-cesses.

Section 186 was enacted after Congress had gained some experience with how the Wagner Act worked in practice. The provision was intended "to deal with problems peculiar to collective bargaining" and in particular "was aimed at prac-tices which Congress considered inimical to the integrity of

the collective bargaining process." *Arroyo v. United States*, 359 U.S. 419, 424–25 (1959); see also *Unite Here Local 355 v. Mulhall*, 571 U.S. 83, 84 (2013) (Breyer, J., dissenting from denial of certiorari) (describing how § 186 operates to discourage corruption of bargaining process). The backers of § 186 "were concerned with corruption of collective bargaining through bribery of employee representatives by employers" and with other related financial risks. *Arroyo*, 359 U.S. at 425–26. The Taft-Hartley Act thus made it unlawful for employers to deliver "any money or other thing of value … to any labor organization." § 186(a), (a)(2).

Congress did not intend, however, to outlaw dues-checkoff agreements. They are not a special opportunity for corruption but a convenient way for employees to pay their union dues. So Congress included this exception to the anti-corruption provision:

> The provisions of this section shall not be applicable …
>
> (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever occurs sooner.

§ 186(c)(4).

This exception sets three, and only three, limits on dues-checkoff agreements, the "written assignment" referred to in

the statute. Such agreements must be (1) individual and (2) in writing, and (3) they must allow an employee to revoke it at least once a year or upon expiration of the applicable collective agreement. Apart from those limits, dues-checkoff authorizations are left to collective bargaining. States are not free to mandate additional restrictions for the benefit of unions, employers, or employees.

In addition to the summary affirmance in *Sea Pak*, the Supreme Court reached the same conclusion in a full opinion interpreting a nearly identical provision in the Railway Labor Act, 45 U.S.C. § 152 Eleventh (b), which was modeled on § 186(c)(4). *Felter v. Southern Pacific Co.*, 359 U.S. 326, 332–33 n.10 (1959).[5] The RLA provision permits dues-checkoff agreements in railroad employee unions under the same conditions set forth in § 186(c)(4).[6] In *Felter*, the Supreme Court interpreted those terms to mean what *Sea Pak* held and what we

---

[5] Where RLA and NRLA provisions "are in all material respects identical," the Supreme Court has used RLA cases as a guide to the NLRA and vice versa. See *Communications Workers of Am. v. Beck*, 487 U.S. 735, 745 (1988) (applying RLA analysis to materially identical NLRA provision), citing *Ellis v. B'hood of Railway, Airline & Steamship Clerks*, 466 U.S. 435, 452 n.13 (1984) (applying NLRA analysis to "equivalent provision" of the RLA).

[6] Notwithstanding any other provisions … a labor organization … shall be permitted to make agreements providing for the deduction … from the wages of its or their employees … any periodic dues … *Provided*, That no such agreement shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization of such membership dues, initiation fees, and assessments, which shall be revocable in writing after the expiration of one year or upon the termination date of the applicable collective bargaining agreement, whichever occurs sooner.

hold today under § 186(c)(4)—Congress left to private actors whether, and if so, how, to formulate a dues-checkoff agreement within the basic parameters set forth in the federal statute. The individual employee must agree to the dues-checkoff, in writing, and it must be revocable at least once every year or at the expiration of the collective bargaining agreement, whichever occurs sooner.

The *Felter* Court explained that when Congress added Section 2 Eleventh (b) to the Railway Labor Act:

> It thus became lawful to bargain collectively for "union-shop" and "checkoff" arrangements; but this power was made subject to limitations. The limitation here pertinent is that, by force of the proviso, the authority to make checkoff arrangements does not include authority to bind individual employees to submit to the checkoff. Any agreement was to be ineffective as to an employee who did not furnish the employer with a written assignment in favor of the labor organization, and any assignment made was to be "revocable in writing after the expiration of one year … ." This failure to authorize agreements binding employees to submit to the checkoff was deliberate on the part of Congress. Proposals to that end were expressly rejected. … [The final bill allowed] the individual employee to decide for himself whether to submit to the

---

Pub. L. No. 81–914, ch. 1220, 64 Stat. 1238 (1951), codified at 45 U.S.C. § 152 Eleventh (b).

checkoff, and whether to revoke an authoriza-
tion after the expiration of one year.

 359 U.S. at 331–32.

The Supreme Court then explained how this language
placed in only private hands the decisions about additional
terms of dues-checkoff authorizations:

> The structure of § 2 Eleventh (b) then is sim-
> ple: carriers and labor organizations are author-
> ized to bargain for arrangements for a checkoff
> by the employer on behalf of the organization.
> Latitude is allowed in the terms of such arrange-
> ments, but not past the point such terms im-
> pinge upon the freedom expressly reserved to
> the individual employee to decide whether he
> will authorize the checkoff in his case. Similarly
> Congress consciously and deliberately chose to
> deny carriers and labor organizations authority
> to reach terms which would restrict the em-
> ployee's complete freedom to revoke an assign-
> ment by a writing directed to the employer after
> one year. Congress was specifically concerned
> with keeping these areas of individual choice off
> the bargaining table. It is plainly our duty to ef-
> fectuate this obvious intention of Congress … .

*Id.* at 333. In *Felter* itself, the Court found that the employer
and the union had violated those statutory ground rules by
refusing to honor a timely revocation notice because it had not
been submitted on a particular form. *Id.* at 330.

Most relevant to this case, however, *Felter* explained the rules that apply as long as private agreements do not contradict the statutory ground rules:

> Of course, the parties may act to minimize the procedural problems caused by Congress' choice. Carriers and labor organizations may set up procedures through the collective agreement for processing, between themselves, individual assignments and revocations received, and carriers may make reasonable designations, in or out of collective bargaining contracts, or agents to whom revocations may be sent.

*Id.* at 334–35. In other words, those matters not governed expressly by the statute were left to the collective bargaining process, just as in *Sea Pak* and *Machinists*.

### 3. *Applying Machinists and Garman Preemption Here*

Here, Wisconsin acted to give employees like Lisa Aplin an additional statutory right under State law: the ability to cancel their duly authorized dues-checkoff agreements mid-year on just thirty days' notice. Wis. Stat. § 111.06(1)(i). The problem is that the Taft-Hartley Act leaves it to private actors—and not the State—to decide how long the dues-checkoff authorization should last, as long as the authorization is individual, in writing, and not irrevocable for longer than one year. 29 U.S.C. § 186(c)(4). The State's attempt to add additional regulatory requirements for dues-checkoffs, and thus to change the scope of permissible collective bargaining, is preempted.

A strong case could be made for *Garmon* preemption here because Act 1 can place employers under inconsistent State

and federal expectations. After agreeing to a new collective bargaining agreement, employer John Deere was caught here in a federal-state bind. It had agreed, in light of federal law, to a collective bargaining agreement with the Machinists that incorporated by reference dues-checkoff agreements irrevocable for one year. Because this decision was inconsistent with Wisconsin's thirty-day revocability requirement, John Deere was told that it could be found responsible for committing an unfair labor practice under *State* law. But if, after executing the collective bargaining agreement, John Deere had decided to ignore its requirements and to comply with Act 1 instead, it could have been brought before the National Labor Relations Board by the union for committing a *federal* unfair labor practice. See, e.g., *Metalcraft of Mayville, Inc. and District Lodge No. 10, Int'l Assoc. of Machinists & Aerospace Workers of Am.*, No. 18-CA-178322, 2017 WL 956627 (N.L.R.B. Div. of Judges Mar. 10, 2017) (analyzing complaint brought by same union against different employer in wake of Act 1). *Garmon* preemption is supposed to prevent just this sort of conflict between State law and the NLRB's authority. See *Brown*, 554 U.S. at 65.[7]

---

[7] Another argument in favor of *Garmon* preemption is that the precise terms of dues-checkoff agreements might be considered a wage-related term of employment, and thus a mandatory subject of bargaining under the NLRA. 29 U.S.C. § 158(a)(5), (d); *Garmon*, 359 U.S. at 245 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board"). We have equated the two before. See *Office & Prof. Employees Int'l. Union, Local 95 v. Wood Cty. Tel. Co.*, 408 F.3d 314, 317 (7th Cir. 2005) (distinguishing "between dues checkoffs and other terms and conditions of employment," but only with respect to the "express-contractual-authorization requirement" for checkoffs). Since *Sea Pak* and

The State responds that there is a simple solution that would allow an employer to resolve this conflict. In the bargaining process, the State says, the employer could simply refuse to agree to any irrevocability period longer than thirty days. That is true in theory, but this argument shows clearly why the State law is preempted under *Machinists*. Under the Taft-Hartley Act, the State simply is not allowed to impose its own view of how best to balance the interests of labor and management in zones that Congress deliberately left for resolution by collective bargaining. *Machinists*, 427 U.S. at 149–50 (both NLRB and States "are without authority to attempt to introduce some standard of properly balanced bargaining power" in such areas) (quotation marks omitted), quoting *N.L.R.B. v. Insurance Agents*, 361 U.S. 477, 497 (1960). Wisconsin's Act 1 tries to short-circuit the bargaining process by telling John Deere and the union they must use a dues-checkoff irrevocability period much shorter than federal law would otherwise permit.

As explained above, *Machinists* applies a rule of field preemption in areas that "Congress intended [to] be unregulated" by the NLRB or the States. See *Brown*, 554 U.S. at 65 (quotation marks omitted), quoting *Machinists*, 427 U.S. at 140. As *Felter* explained, the text and structure of Taft-Hartley's dues-checkoff provision do precisely that—employers and labor organizations "are authorized to bargain for arrangements for a checkoff by the employer on behalf of the organization," and it is "expressly reserved to the individual employee to decide whether he will authorize the checkoff in his case." 359 U.S. at 333. That leaves no room for Wisconsin to

---

*Machinists* provide such a clear answer to the issue presented in this case, we do not need to explore *Garmon* preemption in any more detail.

impose its own regulations in this same field. As in *Felter*, it "is plainly our duty to effectuate this obvious intention of Congress," *id.*, and to keep State law from invading this zone that Congress deliberately left to private actors.

## C. *The State's Arguments for an Exception*

The State offers two more arguments to shield Wis. Stat. § 111.06(1)(i) from preemption. It first argues that preemption analysis should not apply to State dues-checkoff laws because 29 U.S.C. § 186(c)(4), is only an exception to a criminal prohibition against bribery and corruption. Second, the State argues that Taft-Hartley's preemption exemption for State "right-to-work"/mandatory union security agreement laws, § 164(b), applies not only to the kind of agreements mentioned in its text, but also to State laws regulating the terms of dues-checkoff authorizations. Neither argument finds support in the statute or in the Supreme Court's labor law decisions.

### 1. *Section 186's Preemptive Scope*

First, as recounted above, Taft-Hartley's prohibition on employers and their agents giving "any money or other thing of value" to unions in § 186(a) was designed to fight corruption. The exception in § 186(c)(4) goes further, though. It also sets regulatory terms and conditions for lawful dues-checkoffs: "*Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment which shall not be irrevocable for a pe-

riod of more than one year[.]" This proviso shows a regulatory intent, not just a narrowing of the scope of § 186(a)'s criminal liability.[8]

Section 186 is not a generic criminal statute applicable across many different potential contexts, comparable to say, mail or wire fraud. Next to Taft-Hartley's other provisions, the scope, exceptions, and location of § 186 show that it seeks primarily to regulate the interaction between employers and employee representatives, including some key terms of dues-checkoff authorizations. The fact that some violations of these policies may be felonies, see § 186(d), reflects the depth of Congress's commitment to these policy choices. It does not show a choice to limit this section's preemptive effect.

In addition, *Machinists* does not suggest that certain parts of Taft-Hartley should be treated differently in terms of preemption. Where Congress deliberately left choices to private actors, neither the State nor the NLRB may intervene. See *Machinists*, 427 U.S. at 140 & n.4. Even public policy and regulatory decisions in other areas of the law can be preempted under *Machinists* if they have an impact on the collective bargaining process. See above at 15–17.

Finally, by attempting to regulate the revocation period of dues-checkoff authorizations, Act 1 is not a "state law[] of general application" like minimum-wage laws or minimum

---

[8] The exception that immediately follows, § 186(c)(5), regarding union trust funds, provides another example of regulatory choices made in this fashion. Its "*Provided*" language lists permissible uses for trust funds, sets forth a process for approving trust fund plans, and even empowers district courts to appoint "an impartial umpire" to settle certain kinds of disputes. This structure is used elsewhere in federal labor law. See, e.g., § 158(a)(3) (union security agreements and unfair labor practices).

labor standards laws, which are generally not preempted. See *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 753, 755 (1985). Here, Wisconsin seeks to modify a specific federal labor policy choice made in 29 U.S.C. § 186(c)(4), not to enact generally applicable health insurance standards, as in *Metropolitan Life*, see 471 U.S. at 727, or to impose "a minimum labor standard which does not interfere with the collective bargaining process," as described in *Shannon*, 549 F.3d at 1129. This public policy decision in Wis. Stat. § 111.06(1)(i)—to narrow the scope of bargaining between the employer and the union—is preempted.

2.  *The Exception for "Right-to-Work"/Union Security Agreements*

The State also contends that Wis. Stat. § 111.06(1)(i) is permissible because Taft-Hartley's § 14(b) expressly permits States to outlaw mandatory union security agreements in "right-to-work" laws. 29 U.S.C. § 164(b); see also *Sweeney v. Pence*, 767 F.3d 654, 658–59 (7th Cir. 2014) (describing history of § 164(b)). Whether to allow "agreements requiring membership in a labor organization as a condition of employment" is a policy choice that Congress reserved to the States in that provision. § 164(b).[9] Wisconsin contends that the dues-checkoff authorization at issue here is a "maintenance of membership" device best thought of as a union security

---

[9] § 164(b) reads in full:

Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

agreement subject to § 164(b)'s preemption exception. Alternatively, the State contends that § 111.06(1)(i)'s thirty-day maximum is one of the "appropriate tools" the State can use in asserting the policy freedom granted by Taft-Hartley. See *Chamber of Commerce of United States v. Whiting*, 563 U.S. 582, 600–01 (2011) (plurality opinion).

These arguments depend on the mistaken premise that dues-checkoff authorizations *are* union security agreements, i.e., "*agreements requiring membership* in a labor organization *as a condition of employment*," as set forth in the text of § 164(b) (emphasis added). They are not. Dues-checkoff authorizations are optional payroll deduction contracts between employers and individual employees, similar to health insurance premium payroll deductions or retirement savings arrangements. Checkoffs can be mentioned in a collective bargaining agreement, but they need not be. See *Columbia College Chicago v. N.L.R.B.*, 847 F.3d 547, 552–53 (7th Cir. 2017) (explaining that NLRA requires bargaining but not specific contractual outcomes). Unlike public-sector employees subject to collective bargaining agreements, private sector employees cannot be forced to agree to these payroll deductions. Compare *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 181–82 (2007), citing Wash. Rev. Code § 41.59.100 (2006) ("the employer shall enforce it by deducting from the salary" of employees), with 29 U.S.C. § 186(c)(4) (requiring employer to have "received from each employee … a written assignment").

In both *Sea Pak* and *Felter*, the Supreme Court has illustrated the difference between dues-checkoff authorizations and union security agreements, i.e., union-shop or agency-shop provisions. Neither Taft-Hartley nor the Railway Labor

Act in *Felter* equates dues-checkoffs with compulsory union membership. In fact, *Felter* observed:

> The Act makes no formal relationship between a union-shop arrangement and a checkoff arrangement; under [the Act] the parties can negotiate either one without the other, if they are so disposed. And of course, a labor organization member who is subject to a union-shop arrangement need not subscribe to the checkoff; he can maintain his standing by paying his dues personally.

359 U.S. at 337 n.12; see also Dkt. 30–1 at 7 (collective bargaining agreement in this case provided that "if no such authorization is in effect, [a member] must pay his membership dues directly to the Union"). By summarily affirming the district court's § 164(b) discussion in *Sea Pak*, the Supreme Court endorsed the conclusion that § 164(b) "reaches no further" than its terms. 300 F. Supp. at 1201. "Checkoff authorizations irrevocable for one year after [their effective] date do not amount to compulsory unionism as to employees who wish to withdraw from membership prior to that time." *Id.*[10]

---

[10] On the facts of this case, Aplin's dues-checkoff authorization cannot reasonably be considered a union security device. She would not have faced any consequences from the union or her employer if she had never authorized it. It was also, by its express terms, "not a quid pro quo for … union membership." Dkt. 30-3. The dues-checkoff authorization might have become a term of her employment once Aplin signed it, but it was never "a *condition* of employment" as that term is used in § 164(b)—the authorization was a freely adopted optional contractual arrangement with her employer, with its own cancellation terms and conditions that fully complied with federal law. See Dkt. 30-1 at 7; Dkt. 30-3; 29 U.S.C.

To counter these points, the State relies on *Whiting*, a case about federal immigration law and an Arizona business licensing statute, for the idea that it can use "appropriate tools to exercise [the] authority" granted under federal labor law in § 164(b). 563 U.S. at 600–01 (plurality opinion) (discussing 8 U.S.C. § 1324a(h)(2), which permits States to impose "civil or criminal sanctions" on "those who employ … unauthorized aliens" provided this is done "through licensing and similar laws").

Congress did not write § 164(b) nearly as broadly as it wrote the statute in *Whiting*. Courts have rejected reliance on § 164(b) to save State statutes that veered beyond the provision's express scope: agreements between labor and management designed to prevent workers from free-riding on a union's services. See *Idaho Bldg. & Const. Trades Council v. Inland Pacific Chapter of Assoc. Builders & Contractors*, 801 F.3d 950, 954, 958 (9th Cir. 2015), citing *Oil, Chem. & Atomic Workers Int'l Union v. Mobil Oil Corp.*, 426 U.S. 407, 409 & nn.1 & 2, 416–17 (1976) (explaining free-rider problem solved by union-shop and agency-shop agreements); see also *Beck*, 487 U.S. at 744, 746, 748–49 (explaining that under Taft-Hartley's nationwide policy, which outlawed closed-shop agreements where union membership was a *pre*-condition for employment, "Congress authorized compulsory unionism only to the extent necessary to ensure that those who enjoy union-negotiated benefits contribute to their cost").

---

§ 186(c)(4). Aplin enjoyed the convenience of a payroll deduction for thirteen years. Only in the last few months of the arrangement did she seek to change it. *Sea Pak* specifically rejected the notion that this state of affairs amounts to compulsory union membership.

There is no such free-rider concern here. Wisconsin is seeking to modify the terms of voluntary payroll deductions involving an employer and its employee, not mandatory union- or agency-shop requirements that the employer and the union agree to impose on all employees. We know this from the terms of Act 1 itself. Its language invoking the power granted by § 164(b) came in the "right-to-work"/union security agreements provision. 2015 Wis. Act 1, § 5, codified at Wis. Stat. § 111.04(3)(a).

In *Sweeney*, we described the States' § 164(b) freedom as "extensive," 767 F.3d at 660, but the Supreme Court has made clear that before that freedom can apply, there must actually be a proper union security agreement in dispute: "state power, recognized by § 14(b), *begins only with actual negotiation and execution of the type of agreement described by § 14(b)*. Absent such an agreement, conduct arguably an unfair labor practice would be a matter for the National Labor Relations Board under *Garmon*." *Retail Clerks Int'l Ass'n Local 1625 v. Schermerhorn*, 375 U.S. 96, 105 (1963) (*Retail Clerks II*) (emphasis in original). This § 164(b) authority also applies "only where State and federal power are concurrent." *Algoma Plywood & Veneer Co. v. Wis. Employment Relations Bd.*, 336 U.S. 301, 315 (1949); 29 U.S.C. §§ 158(a)(3), 164(b). That is not the case here with respect to dues-checkoff authorizations. Section 164(b) does not authorize States to regulate other arrangements not covered by its terms, such as dues-checkoff authorizations.

*Conclusion*

In light of *Sea Pak*, *Machinists*, and the Supreme Court's other labor preemption decisions, 29 U.S.C. § 186(c)(4) preempts Wis. Stat. § 111.06(1)(i). The judgment of the district

court reaching that conclusion and enjoining enforcement of the State statute is

AFFIRMED.

MANION, *Circuit Judge*, dissenting. Section 302 of the Taft-Hartley Act, an amendment to the National Labor Relations Act, makes it a crime for an employer to give anything of value to a union representing, or seeking to represent, its employees. 29 U.S.C. § 186(a). But the law specifically exempts so-called "checkoff agreements," wherein an employee agrees to set off a portion of each paycheck for union dues, so long as the employee submits a written assignment not irrevocable for more than one year. *Id.* § 186(c)(4). Thus, federal law prohibits checkoff agreements irrevocable for more than one year, but permits those with revocability periods of a year or less.

Nearly 50 years ago, a district judge held that Taft-Hartley's checkoff provision preempted a state law requiring checkoff agreements be revocable at will. Although the state law did not conflict with the federal checkoff provision, the judge concluded that "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." *SeaPak v. Indus., Tech. & Prof'l Emps.*, 300 F. Supp. 1197, 1200 (S.D. Ga. 1969). That decision was summarily affirmed first by the Fifth Circuit and then the Supreme Court, making it the law of the land. 400 U.S. 985 (1971) (mem.). As a result, states have been prohibited since 1971 from regulating checkoff agreements despite scant textual evidence of congressional intent to prevent them from doing so.

Enacted in 2015, Wisconsin's right-to-work law challenges this precedent. In addition to outlawing compulsory unionism, the law requires that checkoff agreements be terminable upon 30 days' notice to the employer. John Deere employee Lisa Aplin tried to take advantage of the new law by revoking

her checkoff agreement, but the union, the International As-
sociation of Machinists, was not pleased and refused to accept
her revocation. Aplin charged that the union committed an
unfair labor practice, and the Wisconsin Department of Work-
force Development agreed. But with the Supreme Court's
summary affirmance in hand, the union obtained an injunc-
tion in federal district court.

The court today affirms, relying not only on *SeaPak*, but on
the doctrine of *Machinists* preemption, a form of labor-specific
preemption that didn't acquire its name until five years after
the *SeaPak* decision. *See Lodge 76, Int'l Ass'n of Machinists &
Aerospace Workers, AFL-CIO v. Wis. Emp't Relations Comm.*, 427
U.S. 132 (1976). In my view, the *SeaPak* summary affirmance
deserves a fresh look. *SeaPak*'s holding that all state regulation
of checkoff agreements is preempted does not fit comfortably
within the *Machinists* doctrine. Nor does it stand up to any
scrutiny under modern general preemption doctrine, which
now requires much stronger textual indications of Congres-
sional intent to displace state regulation. I conclude that de-
velopments over the last 47 years have eroded the precedential value of *SeaPak* to such an extent that we no longer are
obliged to follow it. Therefore, I would permit Wisconsin to
enforce its limitation on checkoff agreements. I respectfully
dissent.

## I. Background

Wisconsin's right-to-work law, known as Act 1, went into
effect on July 1, 2015. Its main provision abolishes compulsory
unionism, declaring that "[n]o person may require, as a con-
dition of obtaining or continuing employment, an individual
to … [p]ay any dues, fees, assessments, or other charges or
expenses of any kind or amount … to a labor organization" or

"any 3rd party." WIS. STAT. § 111.04(3)(a)3 & 4. Further, when an employee chooses to pay dues to a union via a checkoff from the employee's paycheck, such checkoff agreement must be "terminable by the employee giving to the employer at least 30 days' written notice of the termination." *Id.* § 111.06(1)(i). The limitation on checkoff agreements permits employees more flexibility, allowing them to easily stop deductions from their paychecks.

Lisa Aplin worked for John Deere. The International Association of Machinists had a collective bargaining agreement with John Deere to represent the employees at Aplin's plant, but Aplin never agreed to join the union. Nevertheless, she was still obligated before the right-to-work law went into effect to pay dues to the union. She had a checkoff agreement to facilitate that payment. But when her obligation to pay ceased on July 1, 2015, she sought to revoke the checkoff agreement as of July 31. The union refused to honor her revocation request because, according to the union, the request didn't comply with the collective bargaining agreement. Aplin filed a complaint with the Wisconsin Department of Workforce Development, and that agency agreed that the union had committed an unfair labor practice by refusing to accept a revocation deemed lawful under state law.

The union sought declaratory and injunctive relief in federal court on the ground that Wisconsin's restriction of checkoff agreements is preempted by federal law. The district court agreed, concluding that it was bound by the Supreme Court's summary affirmance in *SeaPak*. *Int'l Ass'n of Machinists Dist. 10 v. Allen*, No. 16-cv-77-wmc, 2016 WL 7475720 (W.D. Wis. Dec. 28, 2016). Wisconsin appealed.

## II. Analysis

Preemption arises from the Constitution's Supremacy Clause, which says federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Since state law may not contradict federal law, sometimes the latter will render the former unenforceable. Preemption "may be either express or implied," *Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–53 (1982), but this case concerns implied preemption because "the [National Labor Relations Act] contains no express pre-emption provision," *Chamber of Commerce v. Brown*, 554 U.S. 60, 65 (2008); *see also 520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1125 (7th Cir. 2008).

In implied preemption cases, we presume that "a state law should be sustained 'unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States.'" *520 S. Mich. Ave.*, 549 F.3d at 1125 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). Typically, "[i]mplied preemption analysis does not justify a 'free-wheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in the judgment)). Consistent with that principle, we generally "assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of

Congress.'" *Arizona v. United States*, 567 U.S. 387, 400 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Most importantly, "[e]vidence of pre-emptive purpose is sought in the text and structure of the statute at issue." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). In typical preemption cases, courts no longer attempt to read the tea leaves to determine congressional intent. *See Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring).

But this case concerns labor law. Must we throw general preemption principles, meant to preserve the traditional police power of the States, out the window in this context? The court thinks so. To that end, it contends that the *SeaPak* decision was an early application of (or at least consistent with) *Machinists* preemption. *Machinists* preemption is a species of field preemption in labor law that "forbids both the National Labor Relations Board (NLRB) and States to regulate conduct that Congress intended 'be unregulated because left to be controlled by the free play of economic forces.'" *Brown*, 554 U.S. at 65 (quoting *Machinists*, 427 U.S. at 140) (some internal quotation marks omitted). The rationale is that Congress' choice to protect and prohibit certain labor practices (in Sections 7 and 8 of the NLRA) implies congressional intent that whatever it did *not* protect or prohibit in those sections was meant to be left to bargaining, unregulated by the States. *See 520 S. Mich. Ave.*, 549 F.3d at 1125–26.

Because of this assumption regarding congressional intent, *Machinists* preemption is in some tension with general field preemption principles. As several justices have noted, "recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." *Kurns*,

565 U.S. at 640–41 (Sotomayor, J., concurring in part and dissenting in part) (quoting *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 617 (1997) (Thomas, J., dissenting)); *see also id.* at 638 (Kagan, J., concurring) (criticizing a 1920s application of field preemption as an "anachronism," noting that "Congress had 'manifest[ed] the intention to occupy the entire field of regulating locomotive equipment,' based on nothing more than a statute granting regulatory authority over that subject matter to a federal agency.").[1] Commentators, too, have noticed the Court's recent move away from broad application of field preemption. *See* Lauren Gilbert, *Immigrant Laws, Obstacle Preemption and the Lost Legacy of McCulloch*, 33 Berkeley J. Emp. & Lab. L. 153, 160 (2012) ("Consistent with the emphasis on states' rights in modern Commerce Clause and Tenth Amendment cases, the Court has tended over the last fifteen years to narrow the availability of field preemption and obstacle preemption, absent clear evidence of Congressional intent." (footnote omitted)). But *Machinists* preemption necessarily infers congressional intent from silence. As then-Justice Rehnquist put it, "[t]he entire body of this Court's labor law pre-emption doctrine has been built on a series of implications as to congressional intent in the face of congressional silence, so that we now have an elaborate pre-emption doctrine traceable not to any expression of

---

[1] The court points out that the Supreme Court in *Kurns* still followed the arguably anachronistic preemption holding. But the Court's commitment to *stare decisis* is far stronger when it has issued an opinion on the merits than when the prior case is only a summary disposition. *Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 180–81 (1979). So while *stare decisis* could have justified the result in *Kurns* (especially in a statutory case), the same might not be true were the Court to reevaluate *SeaPak*.

Congress, but only to statements by this Court in its previous opinions of what Congress must have intended." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 623 (1986) (Rehnquist, J., dissenting).

Despite this tension, the Court has given no indication that *Machinists* is in danger of being overruled. *See Brown*, 554 U.S. at 68–69. Yet the 2008 *Brown* decision, holding that a California law restricting certain speech about unions was preempted by the NLRA, relied in part on an express provision of the NLRA, Section 8(c), which "expressly precludes regulation of speech about unionization 'so long as the communications do not contain a threat of reprisal or force or promise of benefit.'" *Id.* at 68 (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969)). The Court said the existence of Section 8(c) (codified at 29 U.S.C. § 158(c)) made that case "easier" than the typical NLRA preemption case "because it does not require us 'to decipher the presumed intent of Congress in the face of that body's steadfast silence.'" *Id.* (quoting *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 188 n.12 (1978)). And before *Brown*, the Court hadn't found a state law preempted under *Machinists* since *Golden State* in 1986.[2]

So, while *Machinists* is certainly still good law, I would hesitate to extend it beyond its current boundaries. After all, even in the labor context, the Supreme Court is "reluctant to infer pre-emption." *Building & Const. Trades Council of Metro.*

---

[2] In *Livadas v. Bradshaw*, 512 U.S. 107, 117 n.11 (1994), the Court mentioned *Machinists* preemption in a footnote, saying that in that particular case the difference between typical conflict preemption and *Machinists* was "entirely semantic, depending on whether Livadas's right is characterized as implicit in the structure of the Act (as was the right to self-help upheld in *Machinists*) or as rooted in the text of § 7."

*Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507
U.S. 218, 224 (1993). "Federal labor law in this sense is inter-
stitial, supplementing state law where compatible, and sup-
planting it only when it prevents the accomplishment of the
purposes of the federal Act." *Metro. Life Ins. Co. v. Massachu-
setts*, 471 U.S. 724, 756 (1985).

This leaves three main questions. First, can *SeaPak* be re-
cast as a *Machinists* preemption case? If it cannot, can it be jus-
tified under modern general preemption doctrine? And if that
does not work, must we still follow it simply because it is a
merits decision of the Supreme Court and it has not been
overruled? I will take these in turn.

### A. *SeaPak* as a *Machinists* Case

The court contends that the *Machinists* preemption doc-
trine supports the *SeaPak* summary affirmance. It essentially
seeks to recast *SeaPak* as a *Machinists* preemption case. Yet I
cannot find any cases describing *SeaPak* this way.[3] On the
other hand, courts have interpreted *SeaPak* as a general field
preemption case (with no mention of *Machinists*). Most re-
cently, the Sixth Circuit characterized *SeaPak* as holding that
"[a]llowing dual regulation under federal and state law
would undermine Congress's purposes and contravene field
preemption." *United Auto., Aerospace, & Agric. Implement*

_____

[3] The district court in *Georgia State AFL-CIO v. Olens*, 194 F. Supp. 3d
1322, 1330–31 n.5 (N.D. Ga. 2016), noted in a footnote that "[d]espite reg-
ulation determining the boundaries of bargaining in this regard, the
NLRA left a window between revocable checkoff authorizations and ir-
revocable authorizations up to a year that would appear susceptible to a
challenge under *Machinist* [sic] preemption as well." But the court did not
characterize *SeaPak* as a *Machinists* case. Rather, it said that even putting
*SeaPak* to one side, *Machinists* preemption might also apply.

*Workers of Am. Local 3047 v. Hardin Cty.*, 842 F.3d 407, 421 (6th Cir. 2016). The court held that "[t]he analysis set forth in *SeaPak* is not conclusive, but it bears the Supreme Court's imprimatur and its authority remains essentially unchallenged by any conflicting case law authority." *Id.*; *see also United Food & Commercial Workers Local 99 v. Bennett*, 934 F. Supp. 2d 1167, 1181–82 (D. Ariz. 2013) ("In finding that the Georgia statute was preempted, the trial judge appeared to rely on both conflict and field preemption.").

Further, the *SeaPak* district court failed to mention any cases that the Supreme Court relied on to establish the *Machinists* preemption doctrine seven years later. Instead, it discussed both conflict and field preemption. The court first concluded that the federal and state statutes were "completely at odds" and could not "coexist." *SeaPak*, 300 F. Supp. at 1200. This was plainly wrong, since Georgia's law requiring checkoff authorizations to be revocable at will did not violate federal law; it was possible to comply with both provisions. Second, the court found "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." *Id.* For support, the court noted that the original version of the legislation in the House would have made it an unfair labor practice for checkoff authorizations to be irrevocable for more than 30 days, but a Senate amendment removed that provision. *Id.* The court rhetorically asked whether, if the legislation had included the original House version of the checkoff restriction, it would "have amounted to a clear Congressional mandate governing deduction of union dues in every state?" *Id.* Of course, it would have, so the court said it couldn't "be persuaded that Federal preemption fails merely because Congress saw fit to adopt a less liberal

power of revocation and then incorporated it in a proviso." *Id.* Such an analysis is not comparable to *Machinists* preemption, but to anachronistic field preemption cases that have fallen out of favor in recent years. I would conclude that *SeaPak* was decided as a general field preemption case.[4]

Even so, leaving *SeaPak* to one side, does *Machinists* require preemption of the Wisconsin regulation here? Admittedly, "congressional intent to shield a zone of activity from regulation is usually found only 'implicit[ly] in the structure of the Act[.]'" *Brown*, 554 U.S. at 68 (quoting *Livadas*, 512 U.S. at 117 n.11). This means that States cannot legislate on top of the protections of Section 7 of the NLRA or the prohibitions of Section 8, on the theory that Congress intended everything else to be left to bargaining. *See Cannon v. Edgar*, 33 F.3d 880, 885 (7th Cir. 1994); *520 S. Mich. Ave.*, 549 F.3d at 1125–26.

Had Congress included the language of Section 302(c)(4) of Taft-Hartley alongside the prohibitions of Section 8 of the NLRA, I might be persuaded that the rationale of *Machinists* required preemption of state regulations mandating shorter periods of irrevocability for checkoffs. Yet, that is not what happened. Instead, the language appears as an exception to a criminal law otherwise barring employers from giving anything of value to unions.[5] 29 U.S.C. § 186(a). And as Wisconsin

---

[4] Nothing in the question presented or the limited briefing available from the *SeaPak* appeals demonstrates that the Fifth Circuit or the Supreme Court considered *Machinists*-like arguments either.

[5] The court says that Section 302(c)(4)'s placement as a criminal law, rather than, say, an unfair labor practice prohibited under Section 8 of the NLRA, simply means that Congress was really committed to the issue. Surely, Congress was concerned with the extended irrevocability of

points out, the Department of Justice, not the NLRB, enforces Section 302's criminal prohibition. Section 302(c)(4)'s position as a safe-harbor exception to a criminal law, rather than as a regulation of the collective bargaining process under Sections 7 and 8 of the NLRA, counsels against a finding of preemption. Moreover, Congress does not "hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). If Congress intended to grant unions an affirmative right to bargain for checkoff agreements irrevocable for a year, it seems highly unlikely it would have placed the language of Section 302(c)(4) in a "provided that" clause of an exception to an anti-bribery statute. *Cf. City of Chicago v. Sessions*, 888 F.3d 272, 285 (7th Cir. 2018) (noting that "[a] clause in a catch-all provision at the end of a list of explicit powers would be an odd place indeed to put a sweeping power to impose *any* conditions on *any* grants").

Further cutting against *Machinists* preemption is that dues checkoff is "designed as a provision for the administrative convenience in the collection of union dues." *NLRB v. Atlanta Printing Specialties and Paper Prods. Union 527, AFL-CIO*, 523 F.2d 783, 786 (5th Cir. 1975). As the Fifth Circuit explained, "Section 302 generally prohibits payments from employers to unions, in order to prevent corruption, but Subsection (c)(4) makes an exception for dues deductions, provided that the

---

checkoff agreements. But Section 302 is primarily a prohibition of employer payments to unions, not a regulation of the collective bargaining process. Checkoffs are only permitted in the first instance as an exception to this general rule, and generally because they are convenient. The structure of the section thus indicates that Congress likely intended simply to place a limit, for the benefit of employees, on its allowance of checkoff agreements. I do not believe we can infer preemption from such a statutory structure.

employee gives voluntary written consent. The emphasis is on protection of the employee, not the union." *Id.* The same is true of the one year limit on irrevocability. If Section 302(c)(4) grants rights to anyone (and it does not appear to do so), it is the employee, who is entitled to exercise his or her free choice to revoke checkoff agreements. *See id.* at 786–87; *Felter v. S. Pac. Co.*, 359 U.S. 326, 333 (1959) (limitations on checkoff agreements are a matter of the "employee's freedom of decision"). In light of this, I cannot agree that Section 302(c)(4) grants *unions* the right to bargain for one year of irrevocability. Nor can I conclude that Congress, in permitting limited checkoff agreements for convenience, intended to prevent the States from further preserving an employee's right to freedom of choice.

As this case demonstrates, the revocability of dues checkoff agreements can pit an individual employee, who desires to revoke her checkoff authorization, against the union, which would prefer to receive automatic dues for the remainder of the agreement. That this case is about employee freedom *from* the union substantially distinguishes it from the typical *Machinists* case dealing with "Congress' intentional balance between the power of management and labor to further their respective interests by use of their respective economic weapons." *Cannon*, 33 F.3d at 885. While management and labor may bargain over the existence and terms of checkoff agreements, neither side adequately represents the freedom of employees to revoke their agreements. It is in the union's interest to procure the maximum irrevocability period allowed under the law, not to bargain for the best interests of its members. Simply put, this case does not involve the same type of regulation of collective bargaining that has justified *Machinists* preemption in the past.

Lastly, the court says that the Supreme Court reached the "same conclusion" as *SeaPak* in *Felter*, but I do not see how *Felter* helps the court. That case was about whether, under the Railway Labor Act's checkoff provision, a union could require an employee to submit his revocation on a particular form furnished by the union. The provision at issue stated that no checkoff agreement "shall be effective with respect to any individual employee until he shall have furnished the employer with a written assignment to the labor organization … which shall be revocable in writing after the expiration of one year … ." *Id.* at 327. The Supreme Court held that Congress intended employees to be able to freely revoke their agreements after the year was up. It saw "no authority given by the Act to carriers and labor organizations to restrict the employee's individual freedom of decision" in collective bargaining. *Id.* at 333.

*Felter* was not a preemption case. It simply interpreted the terms of a particular statute that granted a limited authority to labor and management to bargain for checkoff agreements, subject to each employee's ability to revoke his agreement after a year. To be sure, the Supreme Court held that labor and management could not bargain for additional requirements beyond "a written assignment," but it said so because it interpreted the statute as preserving employee freedom. The up-to-one-year provision in Section 302(c)(4) is similar in that it protects employees from certain bargaining decisions. In some ways, that makes these provisions *counter-examples* for *Machinists* preemption. Rather than reserving a zone of freedom for bargaining, the statutes in *Felter* and here reserve a zone of freedom for employee choice. I cannot conclude that *Machinists* precludes States from expanding that zone.

In sum, I conclude that the Wisconsin law is not preempted under *Machinists*.[6] Therefore, I must continue to determine whether the *SeaPak* district court's general preemption conclusions are still binding on us today.

## B. *SeaPak* under Modern General Preemption Doctrine

Can *SeaPak* withstand scrutiny under modern preemption doctrine? First, a quick review of general implied preemption. It "comes in two types: (1) field preemption, which arises when the federal regulatory scheme is so pervasive or the federal interest so dominant that it may be inferred that Congress

---

[6] The court also suggests that the Wisconsin law might be preempted under *San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959). In *Garmon*, "the Court held that '[w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted.'" *NLRB v. State of Ill. Dep't of Emp't Sec.*, 988 F.2d 735, 738 (7th Cir. 1993) (quoting *Garmon*, 359 U.S. at 245). This case does not concern activity even arguably protected by Section 7 or prohibited by Section 8 of the NLRA. Moreover, *Garmon* preemption "seeks to protect the NLRB's primary jurisdiction in cases involving sections 7 and 8 of the NLRA." *520 S. Mich. Ave.*, 549 F.3d at 1125. But the NLRB has no jurisdiction here; it does not enforce Section 302 of the Taft-Hartley Act.

Further, I would not consider a checkoff agreement to be a wage-related term of employment under Section 8(a)(5) of the NLRA. A checkoff is a device of convenience that allows an employee to more easily pay union dues. It has no effect on the employee's wages or work conditions. Even where the union and management bargain for the existence of checkoffs, employees need not take advantage of them. It is hard to see how a voluntary agreement to pay union dues out of one's paycheck would constitute a term of employment at all.

For these reasons, I would conclude that *Garmon* preemption is inapplicable.

intended to occupy the entire legislative field; and (2) conflict preemption, which arises when state law conflicts with federal law to the extent that 'compliance with both federal and state regulations is a physical impossibility,' or the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Planned Parenthood of Ind., Inc., v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 984 (7th Cir. 2012) (quoting *Arizona*, 567 U.S. at 399). So we have three types of preemption: field preemption and two species of conflict preemption known as impossibility and obstacle preemption. Importantly, preemption analysis "begins with a presumption *against* preemption and focuses first on the text of the statute." *Id*.

Impossibility preemption applies only where it is actually "impossible for a private party to comply with both the state and federal law." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1049 (7th Cir. 2013). Although the *SeaPak* district court said that the federal and state statutes in that case were "completely at odds" and could not "coexist," *SeaPak*, 300 F. Supp. at 1200, it was plainly wrong. Like the revocable-at-will provision at issue in *SeaPak*, the 30-day irrevocability period now mandated by Wisconsin law does not violate federal law. Federal law makes an employer payment to a union under a checkoff agreement a crime only if such agreement is irrevocable for more than one year. The 30-day Wisconsin period falls within the safe-harbor exception granted by Section 302(c)(4) of the Taft-Hartley Act. Since a 30-day irrevocability

period complies with both state and federal law, *SeaPak* cannot be justified under impossibility preemption.[7]

Regarding obstacle preemption, the *SeaPak* district court attempted to ascertain the purpose behind Section 302(c)(4), noting that Senate debate revealed "deep concern about checkoffs and the period during which they may be irrevocable." *Id.* The court theorized that "Congress 'was not indifferent to that subject, but on the contrary, was so vitally interested therein, that it established certain conditions precedent which an employer must meet before he may 'check-off' membership dues.'" *Id.* (quoting *State v. Montgomery Ward & Co.*, 233 P.2d 685, 688 (Utah 1951)). That finding was enough for the district court to hold Georgia's checkoff restriction preempted for creating an obstacle to the enforcement of federal law.

This analysis was questionable in 1969, but it is totally untenable today. As I noted above, today's "[i]mplied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Whiting*, 563 U.S. at 607 (quoting *Gade*, 505 U.S. at 111 ((Kennedy, J., concurring in part and concurring in the judgment)). Looking to the text and structure of the law, and keeping in mind the presumption *against* preemption, I would conclude that obstacle preemption is inapplicable here. That is for

---

[7] The text of Section 8 of the NLRA provides no indication that a 30-day period of irrevocability would constitute an unfair labor practice under federal law, so I do not see how the NLRB could possibly sanction any private parties for complying with Wisconsin law.

much the same reason that I have already concluded *Machinists* is inapplicable, although the finding comes easier in the general preemption context since we need not worry about the inferences drawn from congressional silence that permeate *Machinists* cases. In short, nothing in the text of the NLRA, Taft-Hartley generally, or Section 302(c)(4) specifically indicates any federal objective that would be frustrated by Wisconsin's regulation.

Finally, we have general field preemption. In its most sweeping conclusion, the *SeaPak* district court declared that "[t]he area of checkoff of union dues has been federally occupied to such an extent under [Section 302] that no room remains for state regulation in the same field." *SeaPak*, 300 F. Supp. at 1200. It reached this conclusion relying entirely on legislative history. *See supra* at 9. But, as discussed above, "recent cases have frequently rejected field pre-emption in the absence of statutory language expressly requiring it." *Kurns*, 565 U.S. at 640–41 (Sotomayor, J., concurring in part and dissenting in part) (quoting *Camps Newfound/Owatonna*, 520 U.S. at 617 (Thomas, J., dissenting)). The preemption theory the *SeaPak* district court advanced was entirely atextual, based instead on words Congress *rejected*. *SeaPak*, 300 F. Supp. at 1200. While such cavalier use of legislative history to determine congressional intent was commonplace at the time, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 412 n.29 (1971) (where the *legislative history* is ambiguous, courts should look to the *statute* to determine legislative intent), it has thankfully fallen out of favor, *see Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 536 (2004) (even though a statute was "awkward" and "ungrammatical," it was not ambiguous and so the Court could not consult legislative history). No court today would find that Congress intended to occupy an entire

field based on language that failed to make it into the final bill.

Writing on a clean slate, I would conclude that Wisconsin should be permitted to enforce its limitation on dues checkoff agreements. Nevertheless, I recognize that the Supreme Court's summary disposition in *SeaPak* retains some precedential force. Thus, the final question is whether, even assuming *SeaPak* was wrongly decided, we should still follow it.

## C. Is *SeaPak* Still Binding?

Unlike a denial of certiorari, a summary disposition of the Supreme Court is a decision on the merits of a case. See *Hicks v. Miranda*, 422 U.S. 332, 344 (1975). Therefore, "unless and until the Supreme Court should instruct otherwise," inferior courts should treat summary dispositions as binding "except when doctrinal developments indicate otherwise." *Id.* (quoting *Port Auth. Bondholders Protective Comm. v. Port of N.Y. Auth.*, 387 F.2d 259, 263 n.3 (2d Cir. 1967)).[8] Not surprisingly, the scope of that "doctrinal developments" exception has been the subject of significant debate.

In *Baskin v. Bogan*, 766 F.3d 648 (7th Cir. 2014), this court considered the constitutionality of the marriage laws of Indiana and Wisconsin. We confronted the Supreme Court's summary disposition in *Baker v. Nelson*, 409 U.S. 810 (1972)

---

[8] As I noted above, the Supreme Court has said "that summary affirmances have considerably less precedential value than an opinion on the merits." *Socialist Workers Party*, 440 U.S. at 180–81. However, this appears to apply only to the *Supreme Court's* decisions whether to overrule its own cases. As a lower court, we are bound by summary affirmances unless the *Hicks* doctrinal developments exception applies.

(mem.), which had dismissed an appeal from a same-sex couple challenging Minnesota's marriage laws "for want of a substantial federal question." That decision was no longer binding on the lower courts, we said, because subsequent doctrinal developments in cases like *Romer v. Evans*, 517 U.S. 620 (1996), *Lawrence v. Texas*, 539 U.S. 558 (2003), and *United States v. Windsor*, 133 S. Ct. 2675 (2013), "make clear that *Baker* is no longer authoritative." *Baskin*, 766 F.3d at 660. We so concluded even though none of those cases had questioned *Baker*'s conclusion that no federal constitutional right to same-sex marriage existed. Indeed, on the same day it decided *Windsor*, the Supreme Court also ruled in *Hollingsworth v. Perry*, 570 U.S. 693 (2013), that it lacked jurisdiction to address the marriage question. *See also Lawrence*, 539 U.S. at 585 (O'Connor, J., concurring in the judgment) ("Texas cannot assert any legitimate state interest here, such as national security or *preserving the traditional institution of marriage*." (emphasis added)). The Court ultimately addressed that question in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), but we didn't think it necessary to wait for the Court to overrule its summary disposition in *Baker* before we invalidated the Indiana and Wisconsin laws.[9]

---

[9] Not everyone shares our willingness to "jump the gun" on "overruling" the Supreme Court's supposedly "outdated" cases. In the same marriage context, the Sixth Circuit insisted that *Baker* was still binding on lower courts. Judge Sutton wrote that circuit courts may only "ignore a Supreme Court decision" in two circumstances: "when the Court has overruled the decision by name (if, say, *Windsor* had directly overruled *Baker*) or when the Court has overruled the decision by outcome (if, say, *Hollingsworth* had invalidated the California law without mentioning *Baker*)." *DeBoer v. Snyder*, 772 F.3d 388, 401 (6th Cir. 2014), *rev'd on other grounds sub nom. Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). In his view, "[a]ny other approach returns us to a world in which the lower courts may anticipatorily overrule all manner of Supreme Court decisions based on

If we were willing to discard *Baker* in light of these cases, the same should apply here. As I have demonstrated, the Supreme Court's preemption jurisprudence has evolved significantly since *SeaPak*. The Court is now much more sensitive to federalism concerns and far less likely to imply preemption from ambiguous statutes or legislative history. The *SeaPak* district court's analysis perhaps made some sense in 1969, but it cannot stand alongside modern preemption doctrine. Therefore, under *Baskin*, I would no longer regard it as binding.

### III. Conclusion

Wisconsin has challenged a decades-old Supreme Court summary affirmance preventing it from legislating to provide employees additional freedom to revoke agreements to check off union dues from their paychecks. I conclude that the precedential value of that case, *SeaPak v. Industrial, Technical & Professional Employees*, 400 U.S. 985 (1971) (mem.), has been so eroded by changes to preemption doctrine that we should no longer follow it. The court, perhaps sensing that *SeaPak* is on weak ground under general preemption principles, mostly defends it as an early application of labor-specific *Machinists* preemption. But not only was *SeaPak* not a *Machinists* case, *Machinists* is inapplicable to the Wisconsin law as a matter of first impression. Nor can the result be justified under modern preemption doctrine, which grants the States far more latitude to legislate alongside federal law than they once had.

---

counting-to-five predictions, perceived trajectories in the caselaw, or, worst of all, new appointments to the Court." *Id.*

I am sympathetic to Judge Sutton's narrower approach to the *Hicks* exception, but *Baskin* remains the law in our circuit. If it were otherwise, this dissent would take the form of an opinion concurring in the judgment.

I do not lightly recommend declining to follow Supreme Court precedent. But the *SeaPak* decision cannot stand up to scrutiny under today's preemption doctrines. I am convinced that a court deciding this case today, writing on a clean slate, would find Wisconsin's law not preempted. The changes to preemption doctrine have been so significant that we need no longer follow *SeaPak*. Therefore, Wisconsin should be permitted to enforce its limitation on dues checkoff provisions.

I respectfully dissent.